IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA BAUER, | ) | CASE NO. 1:17-cv-00169 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Maria Bauer ("Plaintiff" or "Bauer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 8. As explained more fully below, the ALJ's analysis of the opinion of Bauer's treating physician Dr. Keppler is insufficient to allow the Court to assess whether the decision is supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

## I. Procedural History

On August 19, 2013, Bauer protectively filed an application for Disability Insurance Benefits ("DIB").[1] Tr. 296, 342, 415-421. Bauer alleged a disability onset date of October 20, 2013. Tr. 296, 415, 448. She alleged disability due to kidney transplant, fibromyalgia, three

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 12/27/2017).

prior shoulder surgeries, muscle inflammation, osteoporosis, joint pain, disease of circulatory system, ruptured rotator cuff, muscle weakness, hyperlipidemia, premenstrual system. Tr. 343, 371, 433. Bauer's application was denied initially (Tr. 371-374) and upon reconsideration by the state agency (Tr. 376-378). Thereafter, she requested an administrative hearing. Tr. 379-380. On October 7, 2015, Administrative Law Judge Jonathan Eliot ("ALJ") conducted an administrative hearing. Tr. 308-339.

In his October 28, 2015, decision (Tr. 293-307), the ALJ determined that Bauer had not been under a disability, as defined in the Social Security Act, from October 20, 2013, through the date of the decision (Tr. 296, 303). Bauer requested review of the ALJ's decision by the Appeals Council. Tr. 291-292. On November 22, 2016, the Appeals Council denied Bauer's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence

### A. Personal, vocational and educational evidence

Bauer was born in 1963. Tr. 302, 312, 415. Bauer and her husband live in their house with their teenaged daughter. Tr. 312-313. Bauer graduated from high school and she attended some college classes but she did not receive a college degree. Tr. 314. She last worked in October of 2013 at a retail job.[2] Tr. 314. She stopped working at that time because she was no longer able to perform her job properly due to her pain. Tr. 314-315, 329. During the administrative hearing, Bauer explained that her pain was so severe at the time she stopped working that, when she got off of work, she would have to sit in her car for 25 minutes before she could start to drive. Tr. 329.

---

[2] Bauer worked part-time at Victoria's Secret from 2004 through 2013 and she also worked part-time at Lerner New York from 2007 through 2010. Tr. 315-317. She took six months off while employed at Victoria's Secret for shoulder surgeries. Tr. 316.

**B.     Medical evidence**[3]

**1.     Treatment history**

On July 16, 2013, Bauer saw Dr. Peter J. Evans, MD, PhD, RFCSC, Director of Cleveland Clinic Upper Extremity Center, for follow up.  Tr. 495.  Dr. Evans noted that Bauer was returning to see him post left rotator cuff repair February 29, 2012, and he also noted that Bauer's right shoulder had been fixed with an interposition graft on January 13, 2010.  Tr. 495; *see also* Tr. 598, 1018-1020.  During her July 16, 2013, visit with Dr. Evans, Bauer complained of pain in both of her shoulders.  Tr. 495.  She indicated she was very active.  Tr. 495.  Dr. Evans's primary diagnosis was rotator cuff rupture.  Tr. 495.  He administered a subacromial injection on the left side and advised Bauer if her pain persisted that she should call to schedule an MRI prior to scheduling a follow-up visit.  Tr. 495.  Dr. Evans also advised Bauer to take analgesics/anti-inflammatories as needed.  Tr. 495.

On August 7, 2013, a left shoulder MRI was performed.  Tr. 892-893.  The impression from the MRI was (1) post-surgical changes of prior rotator cuff repair; (2) massive full-thickness tear involving the supraspinatus and infraspinatus tendons with retraction and muscle atrophy; (3) high-grade partial-thickness tear of the subscapulous tendon; and (4) moderate joint effusion and synovitis extending into the infraspinatus fossa and surrounding the infraspinatus muscle.  Tr. 893.   Bauer saw Dr. Evans on August 22, 2013, regarding her left shoulder MRI.  Tr. 869.  Dr. Evans indicated that the MRI showed "full thickness retracted rotator cuff tear."  Tr. 869.  Dr. Evans's diagnosis was complete rupture of the rotator cuff and he discussed options with Bauer.  Tr. 869.  Following those discussions, Bauer indicated a desire to proceed with open

---

[3] A consultative psychological evaluation was conducted on February 14, 2014.  Tr. 928.  Plaintiff's appeal pertains to her alleged physical impairments.  Accordingly, the medical evidence summarized herein relates primarily to her physical impairments.

rotator cuff surgery and graft interposition. Tr. 869. Dr. Evans noted that the interposition seemed to work well on Bauer's right shoulder. Tr. 869.

On November 8, 2013, Bauer saw Leighanne K. Hustak, CNP, for a pre-op consultation. Tr. 479-486. Bauer was exercising about 60 minutes per day. Tr. 483. She was living with her husband, teenaged daughter and father. Tr. 483. A physical examination showed normal cognition, motor skills and gait and no weakness or sensory deficit. Tr. 486. Also, there was no deformity, edema, tenderness, joint swelling or clubbing observed on physical examination of Bauer's extremities. Tr. 486.

On December 4, 2013, Dr. Evans performed surgery on Bauer's left shoulder. Tr. 1011-1016. The surgical procedures performed were left shoulder arthroscopy; left shoulder arthroscopic extensive debridement of glenohumeral space, anterior, posterior, superior; left shoulder arthroscopic subacromial decompression; and left mini-open rotator cuff repair with Conexa dermal graft, interposition graft. Tr. 1015. During her hospital admission, Bauer complained of right wrist pain. Tr. 1012. An x-ray of Bauer's wrist was taken on December 5, 2013, which showed CPPD arthropathy (calcium pyrophosphate dehydrate crystal deposition disease or psuedogout). Tr. 993, 1012. Rheumatology was consulted and a steroid injection was administered with resolution of the symptoms. Tr. 1012. Bauer was discharged home in stable condition on December 6, 2013. Tr. 1011.

Following surgery, Bauer started physical therapy. Tr. 904-927. During her fifth physical therapy session on January 7, 2014, Bauer reported that she was compliant with her restrictions and she was wearing her sling. Tr. 908. She denied left shoulder pain but was feeling stiff. Tr. 908. On January 9, 2014, Bauer drove herself to her physical therapy session. Tr. 912. She reported no left shoulder pain. Tr. 912. Bauer was compliant with her home

exercise program and shoulder protocol and anxious to move on to the next phase.  Tr. 913.  The following weeks, during a physical therapy session, Bauer reported feeling popping in her left shoulder and down the arm when her husband was performing passive range of motion exercises.  Tr. 920.  Bauer indicated it was a little painful.  Tr. 920.  Bauer felt that, overall, her range of motion was improving.  Tr. 920.  She was taking a half a Tylenol for medication.  Tr. 920.  She felt stiff more than anything.  Tr. 920.  She was sleeping well in bed.  Tr. 920.

On May 26, 2014, Bauer sought treatment at the Southwest General emergency room complaining of painful swelling in the inner thigh of her right leg that started two weeks prior.  Tr. 1194-1214.  Bauer relayed that she had been working out more often but there was no known injury.  Tr. 1194.  Bauer was discharged the same day with diagnoses of groin strain and hematoma of the leg.  Tr. 1202.

Bauer was seen again at the Southwest General emergency room on October 30, 2014.  Tr. 1247-1272.  She complained of left ankle pain and swelling.  Tr. 1247.  A musculoskeletal physical examination showed normal range of motion, normal strength and no swelling.  Tr. 1249.  A physical examination of her back revealed normal range of motion, normal alignment and no tenderness.  Tr. 1249.  Bauer was diagnosed with arthritis of the ankle, left.  Tr. 1249.  While in the emergency room, she was seen by a podiatrist and the podiatrist administered a prednisone injection into Bauer's left ankle.  Tr. 1249.  Bauer was discharged home the same day.  Tr. 1249.

The next treatment relating to Bauer's shoulders occurred on March 19, 2015.  Tr. 1128.  She saw Dr. Louis Keppler, M.D.,[4] with complaints of right shoulder pain and complaints of pain and weakness in her left shoulder.  Tr. 1128.  Bauer complained of constant pain, which she

---

[4] Dr. Keppler's specialty is orthopedic surgery.  Tr. 1132.

rated a 9 out of 10.  Tr. 1128.  Dr. Keppler's notes indicate that Bauer complained that she had

been having the pain since November 14, 2015.[5]  Tr. 1128.  Bauer complained of some

numbness and weakness radiating from her shoulder down into her hand and she complained that

sitting, walking, standing, lying down, lifting, weather, and range of motion made her symptoms

worse.  Tr. 1128.  Dr. Keppler recounted Bauer's surgical history.  Tr. 1128.  He noted Bauer

was taking aspirin.  Tr. 1128.  Dr. Keppler also noted that x-rays brought to the visit by Bauer

showed "high riding shoulder."[6]  Tr. 1128.  Dr. Keppler reviewed films from Bauer's prior

surgery, noting that an MRI report showed that Bauer had severe osteoarthritis of the shoulder

and atrophy of the musculature in her shoulder.[7]  Tr. 1128.  On physical examination, Dr.

Keppler observed that Bauer had a limited range of motion, approximately 80 degrees overhead

elevation and she was extremely weak in both arms, more so on the left than on the right.  Tr.

1128.  Dr. Keppler wanted to review the MRI films and then discuss surgical options, including

cup arthroplasty versus reverse shoulder.  Tr. 1128.  Bauer planned to bring her films in for Dr.

Keppler's review.  Tr. 1128.

Bauer returned to see Dr. Keppler on April 9, 2015.  Tr. 1127.  Bauer complained that

one of her anchors was pulled out and she was quite sore.  Tr. 1127.  Dr. Keppler noted that they

discussed various options, including cuff tear arthropathy resurfacing versus a reverse.  Tr. 1127.

Dr. Keppler indicated he had strong reservations about a reverse, noting that he believed that she

had compromised bone and he would be concerned about the glenosphere loosening in her

---

[5] Since Bauer saw Dr. Keppler in March 2015, it would appear that Dr. Keppler was not referring to November of 2015.

[6] It is unclear when the x-rays were taken.

[7] Dr. Keppler did not specify left or right shoulder.  Tr. 1128.  However, since Bauer's prior surgery before seeing Dr. Keppler was on her left shoulder (Tr. 1015), it appears that Dr. Keppler was referring to Bauer's left shoulder when discussing the films he reviewed (Tr. 1128).

scapula.  Tr. 1127.  Bauer indicated she was going to think about things and noted that she did not want to compromise her summer so she would follow up at the end of the summer.  Tr. 1127.

Bauer sought treatment at the Southwest General emergency room on April 30, 2015, for abdominal pain.  Tr. 1313-1337.  A physical examination showed normal range of motion and normal strength.  Tr. 1316.  Bauer refused pain and nausea medication.  Tr. 1319.  She was diagnosed with non-specific abdominal pain and bloating and discharged the same day.  Tr. 1329-1331.

### 2.    Opinion evidence

#### a.  Treating

On May 1, 2015, Dr. Keppler completed a check-box style form entitled "Medical Source Statement Regarding Shoulders."  Tr. 1130-1131.  Dr. Keppler opined that Bauer had problems in both shoulders.  Tr. 1130.  With respect to Bauer's left shoulder, Dr. Keppler found the following problems – limitation of motion, weakness, pain, muscle atrophy, bursitis, tendinitis, tendon erosion, impingement syndrome, rotator cuff tear, AC joint arthritis (prior to surgery), glenohumeral joint arthritis, and shoulder instability.  Tr. 1130.  With respect to Bauer's right shoulder, Dr. Keppler found the following problems – tendon erosion, impingement syndrome, rotator cuff tear, AC joint arthritis (prior to surgery), glenohumeral joint arthritis, and shoulder instability.  Tr. 1130.  Dr. Keppler opined that Bauer could work no hours per day; she could stand at one time for 60 minutes; she could sit at one time for 30 minutes; she could stand for 4 hours in a workday; she could sit for 4 hours in a workday; she could lift 10 pounds occasionally; she could lift 5 pounds frequently; she could use her left arm below shoulder level occasionally; she could use her right arm below shoulder level frequently; she could never raise her left arm over shoulder level; and she could occasionally raise her right arm over shoulder level.  Tr. 1130-

1131.  Dr. Keppler opined that Bauer suffered from "marked" pain, meaning a "[s]erious limitation, severely limits ability to function (i.e. on task 48%-82% in an 8 hr work day."  Tr. 1131.

**b.  Reviewing**

On February 3, 2014, state agency reviewing physician Dr. Michael Delphia, M.D., completed a physical RFC assessment.  Tr. 352-354.  Dr. Delphia opined that Bauer could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, except as indicated for lift and/or carry.  Tr. 352-353.  Dr. Delphia opined that Bauer had the following postural limitations: frequently climb ramps/stairs, stoop, kneel, and crouch; occasionally crawl; and never climb ladders/ropes/scaffolds.  Tr. 353.  Dr. Delphia opined that Bauer was limited to frequent overhead reaching bilaterally.  Tr. 354.  Dr. Delphia also opined that Bauer would need to avoid all exposure to hazards (unprotected heights, operating heavy machinery or commercial driving).  Tr. 354.

Upon reconsideration, on June 12, 2014, state agency reviewing physician Dr. Gerald Klyop, M.D., affirmed Dr. Delphia's physical RFC assessment.  Tr. 365-368.

**C.    Testimonial evidence**

**1.      Plaintiff's testimony**

Bauer was represented at and testified at the hearing.  Tr. 312-333.   Bauer indicated that she was diagnosed with a left rotator cuff tear in August 2013 and had surgery in December 2013.  Tr. 317.  Thereafter, she attended physical therapy in January 2014.  Tr. 317.  Per Bauer, physical therapy did not help her shoulder condition.  Tr. 317-318.  Bauer indicated that her pain does not go away.  Tr. 318.  She does not take pain medication because she cannot tolerate it – it

makes her throw up.  Tr. 319.  She estimated taking a half a Tylenol about once a month.  Tr. 319.  Bauer discussed her left and right shoulder surgeries, noting continuing problems with both and that her right and left shoulders were equally bad.  Tr. 318-322, 330.

She saw Dr. Keppler in March 2015 for a second opinion regarding her shoulder condition.  Tr. 319-320.  Dr. Keppler recommended further surgery on her left shoulder.  Tr. 320.  He recommended a surgery that involved "a cap in the shoulder for the rotator cuff[.]"  Tr. 321.  The surgery required a four to six week recovery period.  Tr. 321.  Her other physician, Dr. Evans, did not want to try other options because of her prior kidney transplant.  Tr. 320.  Bauer was supposed to have the surgery that Dr. Keppler recommended the month before her administrative hearing but some family issues occurred which caused her not to have the additional surgery.  Tr. 320, 330.  Since January 2014, Bauer had not had any physical therapy.  Tr. 321.  She did perform exercises as part of her home exercise program.  Tr. 321.  Bauer tries to do her home exercises at least three times each week.  Tr. 321.

Bauer explained that her shoulder condition limits her ability to work because, if she sits or stands for a long period of time, she gets pain in her shoulders that goes down into her arms and hands and her arms and hands start to go numb.  Tr. 322-324.  She also gets pain in her shoulder blades that goes up her neck and down her back.  Tr. 323.  She estimated being able to stand for about two hours and walk for about a half hour to an hour before having a problem.  Tr. 323.  She estimated being able to sit for about a half hour to an hour before having a problem.  Tr. 324.  Even if Bauer is not standing or walking for too long, she indicated she still has pain.  Tr. 323.  She estimated her baseline pain level is between and 8 and 9 on a scale of 0 to 10, with 10 being the worst and, a 10 when her pain flares up.  Tr. 323-324.  Bauer estimated having three to seven flare ups per week but indicated that the number of flare ups that she has is dependent

upon the weather as well as the extent of her activities. Tr. 323-324. Bauer has to perform activities at a much slower pace than in the past. Tr. 324. For example, she can only do things for about a half an hour before needing to take a break. Tr. 324. Bauer has problems sleeping at night because of her pain and is fatigued during the day. Tr. 332. She naps for about an hour during the day. Tr. 332.

Bauer also indicated that she can no longer reach and her hands start to go numb, causing problems with using her hands and holding things. Tr. 323, 324-325, 331. Her medical providers have indicated that the problem with her hands is caused by her shoulder, torn bicep muscles, and fibromyalgia. Tr. 325. Bauer wears wrist braces as needed, which she estimated is three to five times per month. Tr. 325-326. For example, to the extent she is able to clean, if she is cleaning at home, she wears her wrist braces. Tr. 326. She is no longer able to garden. Tr. 322. If Bauer cooks, her husband has to carry the pots from the stove to sink because she can no longer pick them up and he has to carry dishes that she has prepared to the table because she can no longer reach. Tr. 322. She indicated she "can barely take a dish into [her] cabinet." Tr. 330. Bauer estimated being able to lift maybe three pounds. Tr. 331.

Bauer's kidney condition is stable. Tr. 326-328. However, she indicated she has been on prednisone for 35 years and the medication has been attacking her bones and muscles in her body. Tr. 327. Bauer indicated she is limited in the type of medication she can take to treat her fibromyalgia so she takes fish oil and vitamins and her doctors have discussed with her different ways of handling her fibromyalgia, including some exercises. Tr. 328. Bauer has tried Neurontin and Trazadone to treat her fibromyalgia but the medication made her pain worse. Tr. 329.

### 2.    Vocational Expert

Vocational Expert ("VE") Kevin Yi testified at the hearing.  Tr. 333-337.  The ALJ found

that there was no past relevant work.  Tr. 317, 334.  The ALJ then proceeded to ask the VE to

assume a hypothetical individual of Bauer's age and education and with her past work history

who is capable of light work; can frequently stoop, kneel, crouch, and climb ramps and stairs but

can never crawl or climb ladders, ropes or scaffolds; can never reach overhead with both upper

extremities; can never work in an environment with unprotected heights, moving mechanical

parts or that requires commercial driving; can frequently handle and feel with bilateral upper

extremities; and can never work in an environment with extreme cold, extreme heat or

concentrated humidity.  Tr. 334.   The VE indicated that there was work in the national economy

for the described individual, including the following unskilled, light jobs – housekeeping cleaner,

merchandising marker, and mailroom clerk.  Tr. 335.  The VE identified national job incidence

numbers for the identified jobs.  Tr. 335.

The ALJ then asked the VE to assume the same individual as described in the first

hypothetical except that the individual would also be limited to occasional reaching forward or

laterally with the upper extremities.  Tr. 335.  The VE indicated that, with that additional

limitation, there would be no competitive, unskilled jobs at the light level.  Tr. 335.   The VE

indicated that there would be jobs available at the sedentary level with that limitation.  Tr. 336.

Bauer's attorney noted that Bauer would grid out[8] at that point and the ALJ did not continue to

---

[8] The phrase "grids out" refers to a claimant being deemed disabled based on application of the Medical-Vocational Guidelines.  The Medical-Vocational Guidelines, known as the "Grids," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grids").  The Grids include rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work. 20 C.F.R. § 404.1569.  The rules do not cover all possible variations of factors.  *Id.*  "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity

ask the VE to identify sedentary jobs that would be available to the individual described in the second hypothetical. Tr. 336.

In response to further questioning, the VE indicated that the standard rate of absenteeism in the national economy was missing work no more than twice each month and the standard breaks are one in the morning and one in the afternoon (approximately 10-15 minutes each) and a 30-45 minute lunch hour. Tr. 336. Also, the VE indicated that, for unskilled jobs, employees should be on task more than 90% of the time, explaining that, if an employee is consistently missing 10% of the work in an unskilled job, employers will not tolerate it. Tr. 336. The VE also indicated that there was no tolerance for lying down during a work shift. Tr. 336-337.

At the conclusion of the ALJ's questioning of the VE, the ALJ asked the VE whether his testimony was consistent with the DOT. Tr. 337. The VE affirmed that it was consistent with the DOT, noting that the DOT does not specifically address missing work, loss of production or employer accommodation but his testimony was based on his experience, his understanding of the jobs, the DOT and the national standards. Tr. 337.

Based on Dr. Keppler's RFC assessment (Exhibit 9F), Bauer's counsel then asked the VE the following question – "If the hypothetical person was to stand four hours in a workday, sit four hours in a workday, lift occasionally ten pounds, lift frequently five pounds, would that be sedentary?" Tr. 337-338. The VE indicated that that hypothetical did not describe a light exertional level and sedentary jobs would be the only jobs that the VE could identify in response to that hypothetical. Tr. 337.

### III. Standard for Disability

---

coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Part 404, Subpart P, § 200.00 of Appendix 2.

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 28, 2015, decision, the ALJ made the following findings:[11]

1.      Bauer meets the insured status requirements through June 30, 2017.  Tr. 298.

2.      Bauer has not engaged in substantial gainful activity since October 20, 2013, the alleged onset date.  Tr. 298.

3.      Bauer has the following severe impairments: fibromyalgia, bilateral shoulder osteoarthritis, s/p left rotator cuff repair, s/p kidney transplant, State II Chronic Kidney Disease, and right wrist arthritis.  Tr. 298-299.

4.      Bauer does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 300.

5.      Bauer has the RFC to perform light work except she can frequently stoop, kneel, crouch and climb ramps and stairs, but she can never crawl or climb ladders, ropes or scaffolds.  She can never reach overhead with both upper extremities and can never work in an environment with unprotected heights, moving mechanical parts or that requires commercial driving.  She can frequently handle and feel with bilateral upper extremities.  Finally, the claimant can never work in an environment with extreme cold, extreme heat or concentrated humidity.  Tr. 300-302.

6.      Bauer has no past relevant work.  Tr. 302.

---

[11] The ALJ's findings are summarized.

7.      Bauer was born in 1963 and was 50 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 302.

8.      Bauer has at least a high school education and is able to communicate in English.  Tr. 302.

9.      Transferability of job skills is not an issue because Bauer does not have past relevant work.  Tr. 302.

10.     Considering Bauer's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Bauer can perform, including housekeeping cleaner, merchandise marker, and mail room clerk.  Tr. 302-303.

Based on the foregoing, the ALJ determined that Bauer was not under a disability, as defined in the Social Security Act, from October 20, 2013, through the date of the decision.  Tr. 303.

## V. Plaintiff's Arguments

In her first argument, Bauer argues that the ALJ failed to properly evaluate the opinion of her treating physician Dr. Keppler.  Doc. 12, pp. 15-18, Doc. 15, pp. 1-2.  In her second argument, Bauer argues that the ALJ's Step Five determination is not supported by substantial evidence because the ALJ's RFC precluded performance of the jobs identified by the VE.  Tr. Doc. 12, pp. 18-19, Doc. 15, pp. 2-5.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Bauer seeks reversal and remand, arguing that the ALJ failed to adhere to the treating physician rule because he failed to explain what, if any, weight was assigned to Dr. Keppler's treating source opinion and failed to provide "good reasons" for not assigning controlling weight to Dr. Keppler's opinion.

The Commissioner contends that, although the ALJ identified Dr. Keppler as a treating physician, Dr. Keppler's opinion is not entitled to deference as a treating physician opinion because he only saw Bauer on two occasions, more than a year after her alleged onset date. Alternatively, assuming Dr. Keppler qualifies as a treating physician for purposes of the treating physician rule, the Commissioner argues that the ALJ properly weighed the treating source opinion evidence.  In this regard, the Commissioner contends that, while the ALJ did not specify

the weight assigned, the ALJ stated Dr. Keppler's opinion was not entitled to controlling weight and "one can reasonably infer that the ALJ accorded the opinion less than controlling weight [and] [o]ne can further infer the weight accorded the opinion by comparing the RFC assessment to the opinion." Doc. 14, p. 18. Further, the Commissioner contends that the ALJ provided "good reasons" for not giving controlling weight to Dr. Keppler's opinion.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for the weight given to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544). Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

The ALJ discussed Dr. Keppler's opinion, stating:

> In addition, there is a treating source statement from Dr. Keppler indicating the claimant is limited to a capacity approaching sedentary work (Ex. 9F). I find this opinion is inconsistent with the other substantial evidence of record, including clinical exam findings, cardiac testing results and absence of formal pain management or rehabilitation. Therefore, it is not entitled to controlling weight (SSR 96-2p).

Tr. 301.

Here, the ALJ referred to Dr. Keppler as a treating source and utilized treating physician terminology, i.e., "controlling weight," and referred to the applicable social security ruling relating to treating source opinions. In light of the foregoing, although Dr. Keppler may have only seen Bauer twice, the Court is not persuaded that Dr. Keppler should not be entitled to treating physician deference.

With respect to the merits of Bauer's treating physician argument, Bauer acknowledges that the ALJ stated reasons why controlling weight was not provided to Dr. Keppler's opinion

but contends that the ALJ's consideration and analysis of treating source opinions falls short of satisfying the requirements of the treating physician rule and regulations regarding weighing of medical opinion evidence from treating sources. The Court agrees.

Here, the ALJ's analysis is not sufficiently specific to allow this Court to determine whether the decision is supported by substantial evidence.

The ALJ did not indicate what amount of weight, if any, was assigned to Dr. Keppler's opinion. The Commissioner contends that "one can reasonably infer that the ALJ accorded the opinion less than controlling weight [and] [o]ne can further infer the weight accorded the opinion by comparing the RFC assessment to the opinion." Doc. 14, p. 18. However, the Court should not be left to infer or speculate with respect to the weight the ALJ assigned or intended to be assigned Dr. Keppler's opinion.

Furthermore, even assuming that the ALJ intended to assign no, some, little or some other amount of weight to Dr. Keppler's opinion and the reasons cited by the ALJ for not assigning controlling weight to Dr. Keppler's opinion are the same reasons that the ALJ decided to assign no or some other unstated amount of weight to Dr. Keppler's opinion, without further explanation by the ALJ, the Court is unable to assess whether the reasons cited are "good reasons." For example, the ALJ indicates that Dr. Keppler's opinion is inconsistent with cardiac test results. Tr. 301. However, the one cardiac test discussed by the ALJ before discussing Dr. Keppler's opinion (Tr. 301, citing Ex. 6F page 139) is dated October 18, 2012, (Tr. 1074), a year prior to Bauer's alleged onset date and over two years prior to Dr. Keppler's opinion. While the ALJ was not necessarily barred from considering this evidence, further explanation regarding how, if at all, the ALJ accounted for the lapse in time between the cardiac test results from 2012 and Bauer's alleged onset date and Dr. Keppler's opinion, is necessary in order for the Court to

assess whether the reason is a "good reason." Also, the ALJ states that Dr. Keppler's opinion is inconsistent with clinical exam findings but fails to state which exam findings are inconsistent. Without further explanation by the ALJ, it is unclear which exam findings the ALJ is referring to, i.e., Dr. Keppler's exam findings or other previous exam findings. Further, the Commissioner argues that the ALJ's decision to assign something less than controlling weight is also supported by evidence showing that Bauer was physically active and/or delayed surgery or had no definitive plans for surgery following her visits with Dr. Keppler. Doc. 17, pp. 15, 17. However, while the ALJ referred to this evidence, the ALJ did not rely on or cite to this evidence as a reason for not providing controlling weight to Dr. Keppler's opinion.

Considering the foregoing, without a more thorough discussion by the ALJ regarding the weight actually assigned to Dr. Keppler's opinion and/or the reasons for not providing controlling weight to his opinion, the Court is unable to assess whether the ALJ's decision is supported by substantial evidence. Accordingly, reversal and remand is warranted for further articulation regarding the ALJ's consideration of Dr. Keppler's opinion, including the weight assigned to the opinion and the reasons for that weight.

In her second argument, Bauer contends that the ALJ erred in relying on the VE's testimony identifying the jobs of housekeeping cleaner, merchandise marker and mail room clerk to support his Step Five determination because there is an alleged inconsistency between the job requirements of those jobs and the ALJ's RFC. The alleged inconsistency, according to Bauer, is that the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), a companion publication to the *Dictionary of Occupational Titles* ("DOT"), SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), indicates that the three jobs identified require frequent reaching but that the RFC limits Bauer to no overhead reaching with both upper

extremities and, additionally, that the DOT's capsule summary for each of the jobs suggests the need to put your arms over your head at some point during the workday. The Court declines to address the merits of Bauer's second argument because, on remand, the ALJ's further evaluation of the medical opinion evidence may have an impact on his findings with respect to the RFC assessment and/or Step Five determination, *see e.g., Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation). However, during the remand proceedings, additional VE testimony should be elicited to make clear whether there is or is not an inconsistency between the RFC assessed by the ALJ on remand and the DOT and/or SCO job requirements for the jobs identified by the VE.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

Dated: December 28, 2017

Kathleen B. Burke
United States Magistrate Judge